FOURNET, Chief Justice.
 

 The plaintiff, Schwegmann Brothers Giant Super Markets, a commercial partnership engaged in the business of selling, at retail, food and other commodities and conducting three very large establishments in New Orleans and its environs, sought an injunction in the Nineteenth Judicial District Court for the Parish of East Baton
 
 *773
 
 Rouge against the Commissioner of Agriculture & Immigration of this State, Sidney J. McCrory, restraining enforcement of the provisions of Act 193 of the Legislature of 1958, known as the Orderly Milk Marketing Act, and attacking its constitutionality on various grounds. Certain producers and processors of milk and milk products, domiciled in various parts of the State, twenty-one in number,
 
 [1]
 
 were allowed to intervene and join with the defendant in defending the legality and constitutionality of the Act. After a full hearing
 
 [2]
 
 there was judgment decreeing that the rule nisi be recalled, vacated and set aside and plaintiff’s suit be dismissed at its cost; and the plaintiff has appealed.
 

 The said Act — -a supplement and amendment to Part VII of Chapter 4 of Title 40 of the Revised Statutes and designated R.S. 40:940.i to 940.15 — according to its title, is “ * * * to protect and preserve the orderly marketing of milk, milk products and frozen desserts listed or referred to herein * *
 
 [3]
 
 and contains a preamble declaring the Legislature’s recognition of the development in the State of unfair competition and trade practices in the sale and distribution of those products, its further recognition of the necessity to protect and
 
 *775
 
 preserve orderly marketing and to prevent certain unfair trade and marketing practices, and expressing the lawmakers’ intent to prevent the economic destruction of many dairy farmers and others dealing in said products because of discriminatory trade practices engaged in by certain financially strong- business organizations to stifle competition — thus presenting “a situation detrimental to the health, welfare and economy of the people of this State.” Among the practices engaged in by the plaintiff and other large chain stores, and sought to be abolished by provisions of the Act, were a system of rebates or discounts from invoice prices; trade concessions, including the furnishing of display and storage equipment, contributions for free use of refrigeration equipment, advertising paid for by those from whom the dairy products were bought; and trucking of the product from North Louisiana, the entire length of the State (by financially powerful distributors and processors not parties here) and offered for sale at prices cut in half and substantially below the market in the locality from which the product was shipped.
 

 The first section of the Act lists the items covered by its provisions, i. e., the various kinds of milk, milk products and “frozen desserts” (40:940.1); the next section contains a definition of terms, including “Non-processing Retailer” which fits plaintiff’s business, and “Cost” which “shall include the
 
 cost” of the
 
 product
 
 to the
 
 non-processing retailer plus cost of doing business— which latter shall include but not be limited to labor costs, including executive salaries, cost of receiving, cooling, processing, packaging, manufacturing, rent, depreciation, power, supplies, selling costs, delivery costs, storing, maintenance of plant and equipment, advertising, transportation, all types of licenses, taxes, fees, insurance, and all other costs of doing business as determined by the Commissioner; and cost shall be allocated proportionately to each unit of product sold “and in no case can any item or unit be sold for less than the unit cost; * * *.”
 
 [4]
 
 (940.2) By the following section (940.3), headed “Disruptive Sales Practices,” it is declared to be a violation for a processor, handler, distributor or bulk milk handler
 
 [5]
 
 to do certain described acts,
 
 *777
 
 including (a) “To discriminate in price between non-processing retailers or between consumers who purchase any of the products listed * * * where such products are offered for sale in the same size and type of .container”, (b) “To give or offer any discount or rebates on products sold * * * ”, (c) “To furnish, give, lend, sell or rent any signs and display material except those advertising only his own products,” and the name or products of the non-processing retailer are not to be included in such signs or display material- — except in the case of installations in place as of July 30, 1958.
 
 [6]
 
 The method is then provided (940.4) of arriving at minimum prices to producers so as to achieve orderly marketing, and is reproduced in full in the margin.
 
 [7]
 

 
 *779
 
 Succeeding sections (940.5 and 940.6), prohibiting certain acts by processors, handlers and/or distributors, need not be detailed. With reference to sales by a non-processing retailer, the Act provides (940.7) : “No non-processing retailer shall with the intent or with the effect of unfairly diverting trade from a competitor, or of otherwise injuring a competitor, or of destroying competition, or of creating a monopoly, advertise, give, offer to sell or sell within the state of Louisiana, any of the items listed or referred to * * * for less than cost, as defined in R.S. 40:940.2. Proof of the advertising, giving, offer to sell or sale of such products by a non-processing retailer for less than cost to such non-processing retailer shall be prima facie evidence of a violation of this Section.” Like provisions are applicable to sales by bulk milk handlers (940.8), followed by prohibition (940.9) of combination sales involving milk products with any other commodity or service at a price less than the aggregate of the prices for each, with intent or’effect of injuring a competitor, destroying competition or creating a monopoly.
 
 [8]
 
 Rebates, discounts, and other trade practices by processors, handlers or distrubutors with intent to destroy competition are prohibited (940.10) except upon final liquidation of business, items sold under court order, where the prices of similar or comparable products are made in good faith to meet legal competition, or bids are made in response to invitation from governing bodies. Non-processing retailers as well as other named handlers of milk are required (940.11) to be licensed by the Commissioner; the method for obtaining the license and provision for revocation are incorporated in this Section. The Commissioner, designated “the instrumentality of the state” for administering the Act and “to execute the legislative intent herein expressed” (940.12), is vested with certain powers deemed appropriate and necessary to that end, including subpoena power; he promulgates regulations pertaining to the purchases and sales of the affected products, and is empowered to issue licenses for the sum of one dollar annually. He is further authorized to assess against those who process or handle any of the products listed, certain fees to cover the cost of administering the provisions of the Act (940.13), the said fees and other monies to be deposited in the state treasury to the credit of a revolving fund, the assessments to be adjusted so that the fund does not exceed a stated amount (940.14). Penalties for vio
 
 *781
 
 lation of the Act are set out in, the final paragraph (940.15).
 

 The market practices which led to this enactment are disclosed by the record, wherein is revealed a system developed by plaintiff under which it received rebates or discounts from the invoice prices
 
 [9]
 
 in addition to trade concessions, such as contributions for its free use of refrigeration, display and storage equipment, and advertising furnished and paid for by those from whom it bought dairy products. There was also the practice by large distributors and processors of trucking merchandise great distances from one end of the State to the other, and selling it to big chain stores at prices cut in half below the current market in that locality. In the words of the Trial Judge, “It does not take much imagination to realize the result of such practices on the small dairies and processors who could make some money at a fair current market price with fair competition, but who were not financially strong enough to meet such abnormal competition.” But the effect of such practices is denied by the plaintiff, who asserts that official statistics of the U. S. Department of Agriculture
 
 [10]
 
 covering the period from 1945 to 1957 reflect an expanding and prosperous dairy industry in Louisiana, showing an increase in quantity, price and cash receipts significantly larger than that of neighboring states and three times the national average; and counsel assert that “What the witnesses [intervenors and • other witnesses for defendant] were unknowingly describing was competition in a free economy.”
 

 In giving his carefully prepared Reasons the Trial Judge observed: “The evidence in this case, some of which has been referred to briefly herein, convincingly sustains the already well known fact that the all-power combination of volume buying and adequate financial resources has developed demands and requirements which the small producer, processor and retailer cannot meet. Nor is it shown that the effect of such a combination has profited the consumer.” One brief reference was to an ice cream processor of Lake Charles who, said the Trial Judge, “explained that his company had been in business for 44 years and that it had made a profit every year except in the last 5 years his business lost money 3 out of the 5 years, and that one more year with the necessary outlay to meet the discount, rebate, trade concessions and contributions required to hold customers would have put his company out of'business. This manner
 
 *783
 
 of testimony was repeated by all the witnesses for the defense. It is further shown that the short period of a few months after August 1, 1958, when Act 193 went into effect, has brought equal and wholesome relief from this disruptive pressure which brought about its enactment. There is no testimony that the discontinuance of these practices * * * has resulted in any material general increase in the retail price to the consumer.”
 
 [11]
 

 The plaintiff’s first and most seriously urged contention is that the Act unlawfully delegates legislative power, including the power to fix prices, in violation of State and Federal due process guarantees. The unlawful delegations are said to be found (a) in Section 940.4, which permits the Commissioner of Agriculture to fix a minimum price, to go into effect only if approved by two-thirds of the producers in a given marketing area (as defined by the
 
 *785
 
 Commissioner) — thus effecting an unlawful delegation to private persons of legislative authority to fix minimum prices, because the producer controls whether any minimum price will be fixed and can effectively control, through use of the veto power, any change in a price once set; (b) in Section 940.1, in that the State Board of Health is given authority to define one of the major product groups regulated by the Act,
 
 [12]
 
 without providing any sort of standard; thus the State Board of Health can control the scope of the Act and “legislate” by extending or narrowing its definition of frozen desserts at will; (c) in a failure to provide adequate standards for exercise by the Commissioner of certain discretionary functions, in violation of the requirements of due process; e. g., by Section 940.2(14), the Commissioner is allowed to create and define “Disruptive Sales Practices” other than those set forth elsewhere in the Act;
 
 [13]
 
 by Section 940.11 he is given discretion to grant, withhold or revoke licenses; by Section 940.2(12) he has authority to determine “cost” by determining what items must be considered as “costs of doing business,”
 
 [14]
 
 and ultimately to define a crime, since other sections (940.5, “Sales by a processor, handler or distributor” and 940.7, “Sales by a non-processing retailer”) declare certain sales below “cost” as defined in the Act to be a violation of its provisions, with attendant criminal penalties. The authorities relied on in the main are Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L. Ed. 1160; City of Alexandria v. Alexandria Fire Fighters Ass’n, 220 La. 754, 57 So.2d 673; Dr. G. H. Tichenor Antiseptic Co. v. Schwegmann Bros. G. S. Mkts., 231 La. 51, 90 So.2d 343, 60 A.L.R.2d 410; State v. Maitrejean, 193 La. 824, 192 So.
 
 *787
 
 361, and State v. Chisesi, 187 La. 675, 175 So. 453.
 

 Defendant and intervenors counter with a denial that private individuals fix minimum prices, .contending that Section- .940.4 sets out factors for the Commissioner to take into consideration in determining the minimum prices in each marketing area, and in that way standards are prescribed for carrying out the legislative will; that private individuals at a referendum and upon approval of two-thirds of the milk producers voting, merely approve such minimum prices- — following which the Commissioner shall require payment of such minimum prices, and therefore no arbitrary discretion is vested in him. Relied on are the cases of Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441, and United States v. Rock Royal Co-operative, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446.
 

 Due to the complexity of our social and industrial activities, the .decisions display an increasing tendency to hold as non-legislative the authority conferred upon commissions and boards to determiné the facts or state of things upon which the law intends to make its action depend. It is now well settled that the Legislature may make the operation or application of a statute contingent upon the existence of certain ponditions, and'may delegate to some executive or administrative board the power to determine the existence of such facts and to carry out the terms of the statute.
 
 [15]
 
 So long as the regulation or action of-the official or board authorized by statute does not in effect determine what the law shall be, or involve the exercise of primary and independent discretion, but only determines within prescribed limits some fact upon which the law by its own terms operates, such regulation is administrative and not legislative in its nature.
 
 [16]
 
 The United States Supreme Court has aptly observed that while powers of administration and legislation are quite distinct, “the line which separates exactly their exercise is not easy to define in words. It is best recognized in illustrations. Undoubtedly the legislature must declare the policy of the law and fix the legal principles which are to control in given cases; but an administrative body may be invested with the power to ascertain the facts and conditions to. which the policy and principles apply. If this could not be done, there would be infinite confusion in the laws, and in’ an effort to detail and particulariz ''ey would miss sufficiency both in provision and execution. * * * If -this were not so, the many administrative agencies created by the state and national governments would
 
 *789
 
 be denuded of their utility, and government in some of its most important exercises become impossible.”
 
 [17]
 

 The case of Currin v. Wallace, supra (306 U.S. 1, 59 S.Ct. 379, 83 L.Ed 441), has important p.oints of similarity to the instant case; the Secretary of Agriculture, authorized by Congress to investigate the handling, inspection and marketing of tobacco and to establish standards by which type and grade might be determined, was empowered to designate the markets in which tobacco was to be bought and sold
 
 if
 
 two-thirds of the growers, voting at a special referendum, favored it, and that provision was attacked as an unconstitutional delegation of legislative power to individuals; but the Court declared that the \ required referendum was merely a condition under which the Secretary was to be bound in the exercise of his administrative powers under the Act. “The intention of Congress is clear that markets thus ascertained shall be designated subject to the prescribed conditions and as rapidly as facilities for inspection are available. We find no unfettered discretion , lodged with the administrative officer. The requirement of a referendum, as already noted, calls for the expression of the wishes of the growers and the Secretary acts merely as an administrative agent in conducting the referendum.” 306 U.S. at page 17, 59 S.Ct. at page 388, 83- L.Ed. at page 452.
 

 The case of United States v. Rock Royal Co-operative, supra (307 U.S. 533, 59 S. Ct. 993, 83 L.Ed. 1446), is very much in point, treating as it does of an order of the Secretary of Agriculture regulating the handling of milk in the New York metropolitan area, which order had provisions similar to our Orderly Milk Marketing Act. There, a section of the Agriculture Marketing Agreement Act of 1937, 7 U.S.C.A. § 601 et seq., under which the Secretary of Agriculture fixed a fluctuating minimum price based on wholesale butter prices in New York, was attacked as an invalid delegation of power.
 
 [18]
 
 In rejecting the attack,
 
 *791
 
 the Supreme Court of the United States said: “While it is true that the determination of price under this section has a less definite standard than the parity tests of Section 2 and 8e, we cannot say that it is beyond the power of the Congress to leave this determination to a designated administrator, with the standards named. The
 
 *793
 
 Secretary must have first determined the prices in accordance with Section 2 and Section 8e, that is, the prices that will give the commodity a purchasing power equivalent to that of the base period, considering the price and supply of feed and other pertinent economic conditions affecting the milk market in the area. If he finds the price so determined unreasonable, it is to be fixed at a level which will reflect such factors, provide adequate quantities of wholesome milk and be in the public interest. This price cannot be determined by mathematical formula but the standards give ample indications of the various factors to be considered by the Secretary.” 307 U.S. at page 577, 59 S.Ct. at page 1014, 83 L.Ed. at page 1472. The Court observed that milk belongs to that category of commodities that for many years has been subjected to the regulatory power of the State, and with reference to an attack on another pertinent provision of the same Act, disposed of the matter in these words: “By subsection (19) it is provided that for the purpose of ascertaining whether the issuance of such an order is approved ‘the Secretary may conduct a referendum among producers.’ The objection is made that this is an unlawful delegation to producers of the legislative power to put an order into effect in a market. In considering this question, we must assume that the Congress had the power to put this Order into effect without the approval of anyone. Whether producer approval by election is necessary or not, a question we reserve, a requirement of such approval would not be an invalid delegation.” (citing Currin v. Wallace, supra) (307 U.S. at page 577, 59 S.Ct. at page 1015, 83 L.Ed. at page 1472).
 

 Plaintiff’s counsel have been diligent in envisaging situations which they consider possible and view with alarm, but we think such fears are unwarranted at this time in the absence of a shred of showing that such happenings, contrary to the intent and purpose of the enactment, might occur. An Act of the Legislature is presumed to be legal until it is shown to be unconstitutional, and the lawmakers would indeed be hard put to draft legislation were it necessary to cover every conceivable contingency or to foresee and prohibit acts of an irresponsible administrator. The purpose and intent of the subject statute is clearly expressed, and the Commissioner of Agriculture, specifically declared to be the instrumentality of the State for the purpose of administering its provisions, is given the duty “to execute the legislative intent herein expressed.” The Supreme Court of the United States, speaking in the Rock Royal case, said: “ * * * It is well settled, therefore, that it is no argument against the constitutionality of an act to say it delegates broad powers to executives to determine the details of any legislative scheme. This necessary authority has never been denied.” We therefore
 
 *795
 
 think that the objections raised by plaintiff on the ground that the Act unlawfully delegates legislative power in certain of its provisions are without merit. The authorities cited in support are distinguishable for various reasons, and in view of our further conclusions set out below are not controlling here.
 

 The plaintiff next contends that the Act violates the due process clauses of the State and Federal Constitutions because the power to regulate private business by coercive price fixing is a legislative function, to be invoked under special circumstances and only'when the measure bears a real, substantial and reasonable relation to the public welfare, and is neither arbitrary nor discriminatory — a criterion which the Act fails to meet.
 

 The trial judge, in disposing of this issue, relied in great measure on the case of Louisiana Wholesale Distributors Ass’n v. Rosenzweig, 214 La. 1, 36 So.2d 403, observing that the “Unfair Sales Law,” R.S. 51:421 et seq., under attack there, is a comparable example of constitutional regulatory legislation, and that he deemed the decision controlling. In this we think he was eminently correct.
 

 In that case the defendant Rosenzweig, as a defense to the charge that he had violated the Unfair Sales Act, contended that such a statute is, in fact, a price fixing 'statute and class legislation, precluding him from freely contracting with regard to his property, in violation of 'due process and equal protection guarantees of the Federal and State Constitutions. This Court, observing that the simple question posed (i. e., constitutionality vel non of the Unfair Sales Act) had been answered adversely to the defendant’s contention by the courts of thirty states which had reviewed the similar acts adopted by their respective legislatures, and that tire underlying principle upon which those decisions are based has the support of opinions of the Supreme Court of the United States, quoted at length from “th'e leading case on this subject, Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 516, 78 L.Ed. 940, 89 A.L.R. 1469,” which posed the question of the constitutionality of a New York milk control law adopted for the purpose of thwarting harmful competition,
 
 [19]
 
 and contained many pertinent observations that were equally applicable in the case then under consideration. Among these were that “ ‘So far as the requirement of due process is concerned, * * * a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither
 
 *797
 
 arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court
 
 functus officio.
 
 * * * . And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. * * * Times without number we have said that the Legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity * * * The constitution does not secure to anyone liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty.’ ” 214 La. at page 10 et seq., 36 So.2d at page 405, quoting from 291 U.S. at page 537, 54 S.Ct. at page 516, 78 L.Ed. at page 957 et seq. We then said: “Such acts have consistently been held not to be price fixing statutes. 'They merely fix the level below which producers and distributors may not sell without injury to a competitor and, ultimately, to the community.” Our conclusion was that •“in adopting this state’s -Unfair Sales Act .for the protection of our economic struc-ture and to prevent the creation or perpetuation of monopolies, the legislature was acting well within its police power.” 214 La. at page 14, 36 So.2d at page 407.
 

 Plaintiff’s counsel, realizing that their 'argument on this phase of the case is foreclosed by the above decisions, advance the thesis that principles announced in the Nebbia case are applicable' only where emergency legislation has grown out of a legislative study — because the New York milk control law, adopted in 1933, was the result of study by a joint legislative committee whose activities extended for nearly a year, following which a comprehensive report was submitted; and counsel say that in the absence of such emergency and study there is lacking any basis which the Nebbia case might otherwise furnish for the regulation of milk marketing and distribution under the subject Act. Those statements are without substance, particularly in view of the principle for which the Nebbia case was subsequently cited by the same Court, when it said: “Recently, upon a reexamination of the grounds of state power over prices, that power was phrased by this Court to
 
 *799
 
 mean that 'upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells.’ ”
 

 [20]
 

 Equally unimpressive is the assertion that the Rosenzweig case is not controlling because we there concluded the Unfair Sales Act was
 
 not
 
 a price fixing statute, where as the Act under attack
 
 is
 
 a price fixing statute — and differences between provisions of the two Acts, termed “significant” and “critical,” are enumerated in brief. Suffice to say that the distinctions made are not of controlling importance, and additional discussion would serve no useful purpose.
 

 It is further objected by plaintiff that the Act creates a presumption of guilt (ignoring the presumption of innocence fundamental under our law) in violation of due process guarantees of both Federal and State Constitutions; that a series of new crimes has been created by Sections 940.5 through 940.10, in that the doing of any one of a number of otherwise harmless acts with the intent or the effect of injuring a competitor, destroying competition, creating a monopoly, etc., is a crime, and while the intent or effect are necessary before the act becomes criminal, those elements are supplied by making the commission of the act prima facie evidence of violation of the section — the fatal defect being, the presumption of the wrongful intent or injurious effect which are essential elements of the crime.
 

 Reference to the wording of the various provisions complained of readily shows that counsel’s analysis is not wholly accurate; they declare that none of the groups or individuals (as therein defined) who handle the products covered by the Act, “with the intent or with the effect of unfairly diverting trade from a competitor, or of otherwise injuring a competitor, or of destroying competition, or of creating a monopoly,” shall do a described thing; and
 
 proof of the doing of the thing
 
 “shall be prima facie evidence of a violation of this Section.” Penalties for such violation are set out in 940.15, and that section makes clear that punishment is by Court action' — ■ the subsection declares that “violation of this Sub-part shall be a misdemeanor, punishable by fine not to exceed five hundred dollars in the discretion of the court,” and refers to injunctions at the suit of any person aggrieved as well as to suits against the violator in the courts of competent jurisdiction.
 

 In State v. Elkin, 177 La. 427, 148 So. 668, this Court had for consideration the constitutionality of a statute (Act 209 of 1914, R.S. 14:71) declaring that failure to
 
 *801
 
 pay a worthless check within ten days after written notice to the drawer of its nonpayment “shall be prima facie evidence of intent to defraud, within the meaning of this act,” and held that the provision did not strip the accused of a presumption of innocence without due process of law, observing “In other words, under [Section 1] the statute, the guilty knowledge of the drawer that his check is worthless when issued constitutes fraudulent intent upon his part. The Legislature has declared that failure to pay the check, within 10 days * * * shall be prima facie evidence of such guilty knowledge or fraudulent intent. There is nothing unreasonable or arbitrary in this clause of the statute. * * * The presumptive clause bears directly upon the guilty knowledge of the accused, and provides a rational relation between the fact proved and that presumed.” Also, “An accused person in this state is permitted to testify in his own behalf, and his testimony is weighed according to the rules of evidence applicable to other witnesses. The presumption of intent to defraud under the statute is prima facie and rebuttable and, therefore, does not deprive an accused of the opportunity to submit all the facts bearing upon the issue.” 177 La. at page 432, 148 So. at page 669. And in Yee Hem v. United States, 268 U.S. 178, 45 S.Ct. 470, 472, 69 L.Ed. 904, the Court said: “Every accused person, of course, enters upon his trial clothed with the presumption of innocence. But that presumption may be overcome, not only by direct proof, but, in many cases, when the facts standing alone are not enough, by the additional weight of a countervailing legislative presumption.” The following, from an earlier pronouncement of the Court, was quoted approvingly: “ ‘Legislation providing that proof of one fact shall constitute prima facie evidence of the main fact in issue is but to enact a rule of evidence, and quite within the general power of government. Statutes, national and state, dealing with such methods of proof in both civil and criminal cases abound, and the decisions upholding them are numerous. * * * That a legislative presumption of one fact from evidence of another may not constitute a denial of due process of law, or a denial of the equal protection of the law it is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate. So, also, it must not, under guise of regulating the presentation of evidence, operate to preclude the party from the right to present his defense to the main fact thus presumed.’ ” 268 U.S. at page 183, 45 S.Ct. at page 471, 69 L.Ed. at page 906.
 

 While counsel oppose on numerous other grounds — i. e., that the Act is arbitrary, unreasonable and capricious; is
 
 *803
 
 so vague, general and indefinite in numerous instances as to be impossible of reasonable, fair and practical administration, etc. —we think that enough has been said to show-that those objections are clearly without merit. And the argument that the statute creates undue burdens on interstate commerce and contravenes the commerce clause of the Federal Constitution is fully answered by the United States Supreme Court when, in treating of a Pennsylvania statute creating a milk control board with authority to fix a minimum price to be paid producers (e. g. farmers), where a milk receiving plant within the state which purchased the commodity for shipment out of the state sought to justify its failure to comply with the statute’s requirements by claiming that it was engaged in interstate commerce, the Court said:
 
 [21]
 
 “ * * * One of the commonest forms of state action is the exercise of the police power directed to the control of local conditions and exerted in the interest of the welfare of the state’s citizens. Every state police statute necessarily will affect interstate commerce in some degree, but such a statute does not run counter to the grant of Congressional power merely because it incidentally or indirectly involves or burdens interstate commerce. This is so even though, should Congress determine to exercise its paramount power, the state law might thereby be restricted in operation. * * * The purpose of the statute under review obviously is to reach a domestic situation in the interest of the welfare of the producers and consumers of milk in Pennsylvania. Its provisions with respect to license, bond, and regulation of prices to be paid to producers are appropriate means to the ends in view. The question is whether the prescription of prices to be paid producers in the effort to accomplish these ends constitutes a prohibited burden on interstate commerce, or an incidental burden which is permissible until superseded by Congressional enactment. * * * ”
 

 For the reasons assigned, the judgment appealed from is affirmed.
 

 SIMON, J., recused.
 

 [1]
 

 .These are: Blu-Ribon Dairies, Inc., Parish of Rapides; Claiborne Creameries, Inc., Parish of Claiborne; Nick FaKouri, d/b/a Clover Farm Creamery, Parish of St. Landry; Farmers Dairies, Inc., Parish of Lincoln; Walter Bison, d/b/a Fair View Farm Dairy, Parish of Caddo; John S. Green, d/b/a Green Brothers Dairy, Parish of Morehouse; Guth Dairies, Inc., Parish of Calcasieu; Charles Hamel, d/b/a Hamel’s Dairy, Parish of Caddo; Briley Spears, d/b/a Leading Dairy, Parish of Calcasieu; Louisiana Creamei'y, Inc., Parish of East Baton Rouge; Glen O. Dunmire. Jr., d/b/a Lynn’s Dairy Products, Parish of Caddo; J. B. Davis, d/b/a The Milk House, Parish of Franklin; John ■ P. White, d/b/a Pelican Creamery, Parish of Iberia; D. Stafford O’Shee, d/b/a Quality Ice Cream Company, Parish of Rapides; Jesse H. Cutrer, Jr., d/b/a Red Bird Ice Cream Company, Parish of Washington; E. Leroy Miller, d/b/a Sanitax-y Dairy Products Company, Parish of Webster; S. J. Phillips, d/b/a Spring Valley 'Dairy,- Parish of Caddo; William G. Broussard, d/b/a Vermilion Ci’eamery, Pax-ish of Vex'milion; Watson’s Ice Cx’eam Factory, Inc., Parish of Calcasieu; C. A. Stewart, d/b/a C. A. Stewart Dairy, Parish of Washington; and Clyde DeLaughter, d/b/a Bogalusa Dairy Products, Parish of Washington.
 

 [2]
 

 . It was stipulated that the evidence offered on the application for a preliminax-y injunction should be considered by the Court as evidence on behalf of all parties on the application for permanent injunction without further trial.
 

 [3]
 

 . The title further declares that the Act is one “to prevent disruptive trade practices; specifying the items covered by this act; defining the terms xised therein; authorizing the establishment of minimum px-ices under certain conditions; providing regulations for the sale, transfer or other disposal of the products mentioned and for trade practices . connected therewith; establishing license requirements; vesting in the Commissioner of the Louisiana Department of Agriculture and Immigration certain powers, duties and functions; providing penalties and establishing remedies for the violation of this Act; repealing all laws or parts of laws in conflict herewith.”
 

 [4]
 

 . There is a proviso that “in the absence of specific evidence that the cost of doing business as herein defined for a non-processing retailer is less than eight percent, the cost of doing business * * * shall be presumed to be not less than eight per cent of the invoice price and this cost shall be calculated to the nearest half cent per sales unit. * * * ” (940.2)
 

 [5]
 

 . The producer is the dairy farmer who obtains the raw milk from the cow and sells it to the processor, handler or distributor; the processor or handler (who may also in some cases be a distributor, or who may sell direct to the consumer) is the one who processes (i. e., cools, pasteurizes, homogenizes, flavors, etc.) the milk and packages it before it is delivered to the seller for sale to the pub-
 
 *777
 
 lie; a distributor is one who sells the products for purpose of resale or further processing; and a bulk milk handler is one who furnishes milk in cans, tan'k cars or tank trucks to the processor or handler. (Definition of terms, 940.2)
 

 [6]
 

 . The remaining violations enumerated in this subparagraph are: (d) “To make payments of money, credit, gifts or loans to non-processing retailers or their employees or for rental for the storage or display of any of the products” covered by the Act; (e) “To sell any non-processing retailer any new fixture or equipment for less than a mark-up” as specified, and “any used equipment sold to a non-processing retailer by processor, handler, distributor, or bulk milk handler shall be sold” on the basis of price arrived at in a certain way; (f) “To make any loan” or guarantee or underwrite any financial obligation of a nonprocessing retailer; (g) to extend credit to a non-processing retailer to exceed 60 days, and delinquent accounts beyond 90 days subjects the non-processing retailer to revocation of his license; (h) to make or maintain repairs to the equipment of the non-processing retailer at less than usual charges; (i) to make a gift to him of money or merchandise, soda fountain, carbonator, services or material, or to help him conduct his business (except as permitted elsewhere) ; (j) to sell any product listed in the Act at “dock prices at places other than the point of processing,” and if at the point of processing, the dock price shall be augmented by any transportation cost to place of distribution. The final violation is (k) refusal by a handler, processor or distributor to accept milk from a milk producer as a result of the latter’s affiliation with a cooperative association. (940.3)
 

 [7]
 

 . “Upon written request of 50 per cent or more of the dairy farmers who regularly supply milk to a milk marketing area, the commissioner shall determine, by official order, after public hearing in which all interested persons shall be given reasonable opportunity to be heard, the appropriate area to be included in the marketing area and minimum prices to be paid for milk by processors or handlers, distributors or bulk milk handlers for milk received. Such minimum prices in any milk marketing area within the state shall be beneficial to the public interest, protect the dairy industry of the state, and insure a sufficient quantity of pure and wholesome milk for inhabitants of this state. In determining the minimum prices, the commissioner shall take into consideration the following factors operative in each marketing area; the quantity of fluid milk produced and disposed of; the cost of dairy feed, farm labor, and other economic conditions affecting the production and sale of milk in the area. The commissioner shall, upon approval by % of the producers voting at a referendum in the marketing area, require payment of such appropriate minimum prices for milk in the respective marketing areas.”
 

 [8]
 

 . By further provision of the subsection, “Proof of the advertising, giving, offering to sell or sale of such product with any other commodity or service at a combined price which is less than the ag~ gregate of the price for which such product and the other commodity or service are offered for sale shall be prima facie evidence of a violation of this Section.” (940.9)
 

 [9]
 

 . One of the plaintiff-owners in this case testified that plaintiff first deducted 5% of the invoice price of milk and milk products, then added a cost mark-up of 6% of the remainder.
 

 [10]
 

 . The publications introduced as exhibits by plaintiff are: Dairy Statistics, U. S. Dept. of Agriculture . (Oct. 1957); Milk-Farm Production, Disposition, and Income, 1956-1957, U. S. Dept. of Agriculture; The Farm Income Situation, U. S. Dept, of Agriculture (Sept. 1958).
 

 [11]
 

 . Other testimony to the same effect was (a) By a processor and small distributor in Webster and Olaiborne Parishes, who got caught in a “milk war” between two major concerns in Monroe and Shreveport, with the result that milk in super markets in his locality dropped from 52 cents to 39 cents a half gallon — yet the price where the milk was processed, bottled and put up for wholesale distribution by one of those major concerns was 49 cents a half gallon and it then had to be hauled 100 miles to a dock plus 30 miles from there to the witness’ area; (b) By a man in the milk business for some 30 years in the Alexandria area, who described the same situation when a big distributor, which bottled and processed the milk 130 miles away, started selling to chain stores below cost; (c) By an ice cream manufacturer of Olaiborne Parish who lost accounts because he had to refuse to give discounts and rebates and to furnish free a refrigerated cabinet for storage and display of non-dairy foods such as frozen foods, meats, etc.; and who also lost accounts to a “big chain” which quoted a price of 50 cents per half gallon for ice cream when the list price was 80 cents; (d) By a dairyman in Lake Charles, who at one time had employed 38 people but because of the loss of approximately one-third of the volume of his business due to the tactics being used in the milk industry had found it necessary to reduce his force considerably — his loss of business having been caused in large part because milk imported from Shreveport was selling in Lake Charles for 39$ — the while the same quantity and quality were being sold in Shreveport for 45$; (e) By a retail grocer, who stated that the volume of his business on all items fell off because he was having to buy milk at a higher price than the selling price of his competitors, made possible because they were getting discounts and he was not; and (f) By a disinterested witness, with wide knowledge and experience in the field of marketing and utilization of milk and milk products, who testified concerning the practice of big chains of selling at a loss in a particular area but maintaining the prices in another area to make up the losses. This witness, who, under authority of the U. S. Secretary of Agriculture, had prepared the Federal orders under which milk was being sold in
 
 the
 
 Shreveport area, stated that the procedure for determining a fair minimum price under the Louisiana statute was identical to that under the Federal Act except for the jurisdiction. With reference to the “loss leader” sales of milk, he aptly observed: “Therefore, I think it could be concluded properly that the Shreveport housewife was subsidizing the Lake Charles housewife to some extent.”
 

 [12]
 

 .Section 940.1, after listing the various kinds of milk and milk products covered by the Act, provides: “Also, all frozen desserts as defined in Section 1 of Chapter XXV of the Sanitary Code of the State of Louisiana as revised through February 22, 1957, including any subsequent revisions.” The said Section 1 defines a frozen dessert as “any sound and clean, frozen or partially frozen combination of two or more of the following : Milk or milk products, vegetable fat, animal fat, other food products approved by the Louisiana State Board of Health, eggs or egg products, nutritive sweetening ingredients, artificial sweetening ingredients (use only in diabetic desserts), water, confection (defined in Section 5), nut meats, fruit or fruit juices, citric or other organic food acid or other wholesome flavoring agents and colors together with harmless stabilizer, and shall be deemed to include ice cream, fruit ice cream, nut ice cream, ice milk, frozen malt ice cream, french ice cream, milk sherbert, ices or water ices, mellorine, olarine, sherine, and icicle bars.”
 

 [13]
 

 . That paragraph provides “Disruptive Sales Practices” means those practices which are prohibited in R.S. 40:940.3 or such other practices as may be determined by the commissioner to be disruptive of orderly marketing. (R.S. 40:940.-2(14))
 

 [14]
 

 . The term “cost”, defined in 940.2(12), is composed of the various factors there listed, “and all other costs of doing business as determined by the commissioner.” •For a more complete quotation see the third paragraph of this opinion.
 

 [15]
 

 . For a further statement of these principles, and pertinent authorities, see City of Alexandria v. Alexandria Fire Fighters Ass’n, 220 La. 754, 57 So.2d 673.
 

 [16]
 

 . See Annotation, Delegation of Legislative Power, 79 L.Ed. 479, 481 et seq.
 

 [17]
 

 . Mutual Film Corp. v. Industrial Commission, 236 U.S. 230, 35 S.Ct. 387, 392, 59 L.Ed. 552, Ann.Cas.1916C, 296.
 

 [18]
 

 . That suit was instituted by the United States for a mandatory injunction requiring the defendant milk cooperatives and milk handlers to comply with Order No. 27 of the Secretary of Agriculture regulating the handling of milk in the New York Metropolitan area, and also, if it should be found that defendants were not subject to that Order, then alleging violation of Official Order No. 126 issued by the Commissioner of Agriculture and Markets of the State of New York. The two orders were in pari materia, one covering milk moving in interstate commerce, and the other covering milk in intrastate commerce. The Commissioner of Agriculture and Markets of the State of New York was permitted to intervene as party plaintiff, and sought an injunction commanding the defendants to comply with his Order No. 126 or, if it did not apply, then to comply with the Order of the U. S. Secretary of Agriculture. The answers challenged the two orders as contrary to the Fifth and Fourteenth Amendments to the Constitution, and
 
 *791
 
 challenged the Act of Congress as involving improper delegation of legislative power. It appears that in the final analysis the controversy revolved almost entirely around Order No. 27, backed by the Statute under which it was issued, a provision of which authorized the Secretary, if he finds after a hearing that minimum prices with a base period purchasing power are unreasonable, to fix minimum prices so as to reflect the prices of available supplies of feed and other economic conditions; it also
 
 provided
 
 for use of voluntary agreements as to certain specified commodities, including milk, and for orders instead of agreements when the Secretary of Agriculture had reason to believe that issuance of an order would tend to effectuate the declared policy of the Act, and after notice and an opportunity for hearing; in such Order the Secretary was required to set forth a finding upon the evidence introduced at the hearing, and that the issuance of the Order and the terms and conditions thereof would
 
 tend to
 
 effectuate the declared policy (Section 1 declares that the disruption of orderly exchange of commodities impairs the purchasing power of farmers, thus destroying the value of agricultural assets to the detriment of the national public interest). Orders may only be issued after hearing upon a marketing agreement which regulates the handling of the commodity, and do not become effective unless approved by a majority of the handlers — but notwithstanding the refusal or failure of handlers to sign a marketing agreement relating to the commodity the Secretary of Agriculture, with approval of the President, may issue an order if he determines that the refusal or failure of the handlers to sign such agreement tends to prevent the effectuation of the declared policy with respect to the eommodity and that the issuance of the order is the only practical means of advancing the interest of the producers. In such a case the order must be approved or favored by two-thirds of the producers in number or volume who have been engaged, during the period, in the production for market of the commodity within the area, or by two-thirds of those engaged in the production of the commodity for sale in the marketing area. A referendum is authorized to determine whether the issuance of the order is approved by the producers.
 

 Among pertinent observations made by the Court in the course of a lengthy examination of the Act, including phases with which we are not here concerned, is one distinguishing the case of A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 538, 55 S.Ct. 837, 79 L. Ed. 1570, 15S4, 97 A.L.R. 947, cited by the plaintiff here as “probably the leading case on the subject of the constitutional delegation of legislative power,” as follows: “Unlike the language of the National Industrial Recovery Act [48 Stat. 195] condemned in the A. L. A. Schechter Poultry Corp. case, 295 U.S. page 538, 55 S.Ct. page 846, 79 L.Ed. 1570, the tests here to determine the purpose and the powers dependent upon that conclusion are defined. In the Recovery Act the Declaration of Policy was couched in most general terms. In this Act it is to restore parity prices * *. Under the Recovery Act, general welfare might be sought through codes of any industry, formulated to express standards of fair competition for the businesses covered. I-Iere the terms of orders are limited to the specific provisions, minutely set out * * *. While considerable flexibility is provided * * *, it gives opportunity only to include provisions auxiliary to those definitely specified.”
 

 [19]
 

 . The defendant complained that the Board’s order fixing minimum prices discriminated unfairly against him as a . “cash and carry” dealer in milk since his rivals in the trade who had no store but only a wagon and delivery route were allowed to sell pints of milk as low as lie ..did,, with delivery to the customer’s door as a bonus.
 

 [20]
 

 . United States v. Rock Royal Co-operative, 307 U.S. 533, 59 S.Ct. 993, 1011, 83 L.Ed. 1446, 1468, citing Nebbia v. People of State of New York, 291 U.S. 502, 537, 54 S.Ct. 505, 78 L.Ed. 940, 957, 89 A.L.R. 1469.
 

 [21]
 

 . Milk Control Board of Pennsylvania v. Eisenberg Farm Products, 306 U.S. 346, 59 S.Ct. 528, 530, 83 L.Ed. 752, at page 756.