184 So.2d 247 (1966)
George FRANCIS et al.
v.
LOUISIANA STATE LIVESTOCK SANITARY BOARD et al.
No. 6591.
Court of Appeal of Louisiana, First Circuit.
February 28, 1966.
Rehearing Denied April 4, 1966.
*248 John J. McCann, New Orleans, for appellants.
Joel B. Dickinson, Baton Rouge, for appellees.
Before ELLIS, LOTTINGER, LANDRY, REID, and BAILES, JJ.
REID, Judge.
This suit involves a joint petition for injunctive relief against the Louisiana State Livestock Sanitary Board and other named defendants, asserting that the petitioners, as owners of 3000 head of swine, are and will be irreparably injured and adversely affected by regulations put into effect by the said Louisiana State Livestock Sanitary Board. The suit is based upon the alleged unconstitutionality of LSA-R.S. 3:2095 and 3:2096, as amended, and in the alternative the maladministration of said act, and in the further alternative that the adoption and perpetuation of defendant Board's Regulation 9 is arbitrary, capricious, and unreasonable.
The respondents' plea for reconventional demand was denied by the District Court, and is not now before this Court on appeal.
The plaintiffs are a group of hog farmers known in the genteel language of their chosen industry as "garbage feeders," that is, said petitioners collect garbage on a contractual basis from garbage suppliers such as hotels, restaurants, hospitals, military establishments, and other commercial establishments.
The petitioners contend that the Legislature of the State of Louisiana has not enacted a law specifically requiring the cooking of garbage before feeding it to swine as have other states, but the defendant Board (established pursuant to Art. 6, Section 14, of the Constitution, and R.S. 3:2095) has promulgated Regulation 9 which requires that the garbage be boiled for a period of 30 minutes before feeding it to hogs. Failure to do so subjects the violator to certain criminal charges and to a quarantine which remains in effect for not less than 30 days *249 after a Board inspector observes a resumption of the boiling process.
Petitioners further contend that since their hogs are free from contagious or infectious diseases of swine, that a quarantine of their hogs, while free from disease, constitutes a deprivation of their property rights without due process of law.
The Trial Judge rendered judgment in favor of defendants and against plaintiffs denying a permanent injunction and denying plaintiffs' demand for judgment decreeing LSA-R.S. 3:2091 through 3:2096 unconstitutional, and for like reasons denied defendants reconventional demand for damages on the grounds of not being supported by the evidence. Plaintiffs' motion for a new trial was overruled, hence this appeal.
The first issue before the Court is the constitutionality of R.S. 3:2095 and R.S. 3:2096, passed by the Legislature of the State of Louisiana pursuant to Article 6, Section 14 of the Constitution.
The parties herein have chosen to deal with the issue with regard to an analogy, or lack of analogy, to the establishment of the Louisiana State Board of Health and the Constitutional mandate to do so. It is therefore necessary at this time to consider the acts establishing the Louisiana State Board of Health and the Louisiana State Livestock Sanitary Board, and the constitutional provisions for both.
The Legislature was instructed to create the State Board of Health by Art. 6, Section 11, of the Constitution, said section stating:
"The Legislature shall create for the State and for each parish and municipality therein, Boards of Health, and shall define their duties and prescribe their powers."
This mandate was carried out by the Legislature in R.S. 40:1 et seq., establishing the State Board of Health and Parish Board of Health, the State Board being established more specifically by Section 11 of said Chapter as follows:
"The board shall prepare or cause to be prepared, a sanitary code for the state. This code shall contain rules, regulations, and ordinances for the improvement and amelioration of the hygienic and sanitary conditions of the state."
On the other hand, the Legislature created the Livestock Sanitary Board relying on Article 6, Section 14, of the Constitution for authorization, which reads as follows:
"The Legislature is hereby directed to enact laws fostering agriculture and immigration, and preventing the spread of pests and diseases injurious to plants and domestic animals."
The Board was provided for more specifically by R.S. 3:2095 which states as follows:
"The State Live Stock Sanitary Board shall have plenary power to deal with all contagious and infectious diseases of animals as in the opinion of the board may be prevented, controlled, or eradicated, and with full power to make, promulgate and enforce such rules and regulation as in the judgment of the board may be necessary to control, eradicate, and prevent the introduction of Texas or tick fever and the fever-carrying tick (Margaropus Annulatus) and all other diseases of animals."
Further, R.S. 3:2096 provides:
"Whoever violates any provision of this Part or any regulation of the Livestock Sanitary Board or interferes with any duly appointed officer of the State Livestock Sanitary Board shall be fined not less than fifty nor more than one thousand dollars, or imprisoned for not less than thirty days nor more than one year, or both, and shall also be liable to any persons injured for all damages resulting from the violation."
*250 It is the petitioners' contention that the two Constitutional mandates may be easily distinguished, the former directing the Legislature specifically to set up the various boards, while the latter specifically requires that the Legislature enact laws dealing with livestock sanitation. On the other hand, the respondents maintain that it is impossible to distinguish between the constitutional provisions, and that to hold the legislative act creating the defendant Board and granting it the power to deal with contagious and infectious diseases unconstitutional would in effect hold that act creating the State Board of Health would likewise be unconstitutional as well as the sanitary code promulgated by said Board.
Although it can't be denied that the respective Constitutional mandates vary in their wording and form, it must be remembered that an act of the Legislature is presumed to be legal until it is shown to be unconstitutional. Schwegmann Brothers Great Super Markets v. McCrory, Commissioner of Agriculture and Immigration of the State of Louisiana, 237 La. 768, 112 So. 2d 606. Therefore, the burden is upon the petitioners to overcome their presumption which it cannot do merely by pointing out the differences between the Constitutional authority involved and that of another admittedly valid piece of legislation.
The petitioners continue, however, that the provisions of R.S. 3:2095 itself are sufficient to uphold the contention of unconstitutionality, as it is a complete surrender of the legislative process. Petitioners then cite substantial authority generally to the effect that unless there is a declaration of policy coupled with specific and identifiable standards, the delegation of power is arbitrary and unconstitutional; (Ezell v. City-Parish Plumbing Board of Baton Rouge, 234 La. 441, 100 So.2d 464; Banjavich v. Louisiana Licensing Board for Marine Divers, 237 La. 467, 111 So.2d 505; State v. Morrow, 231 La. 572, 92 So.2d 70; and Hunter v. Hussey, La.App., 90 So.2d 429) such being the case here.
Respondents, however, cite the more recent case of Schwegmann Brothers Giant Super Markets v. McCrory, supra, which upheld the constitutionality of the Orderly Milk Marketing Act, R.S. 40:940.1 et seq., permitting the Commissioner of Agriculture to fix minimum prices, create and define disruptive sale practice, to grant, withhold or revoke licenses, and to define a crime. In reaching their decision, the Louisiana Supreme Court made the following observations:
"Due to the complexity of our social and industrial activities, the decisions display an increasing tendency to hold as non-legislative the authority conferred upon commissions and boards to determine the facts or state of things upon which the law intends to make its action depend. It is now well settled that the Legislature may make the operation or application of a statute contingent upon the existence of certain conditions, and may delegate to some executive or administrative board the power to determine the existence of such facts and to carry out the terms of the statute."
Clearly, the Legislature has done no more than allow the defendant board to make judgment of fact, i. e., the necessary controls to eradicate the diseases of animals and to carry out the terms of the statute, i. e. to put these controls into effect.
This delegation is, however, subject to the following test:
"So long as the regulation or action of the official or board authorized by statute does not in effect determine what the law shall be, or involve the exercise of primary and independent discretion, but only determine within prescribed limits some fact upon which the law by its own terms operates, such regulation is administrative and not legislative in its nature."
Again, it is clear that the Legislature has not granted "primary and independent *251 discretion" to the defendant board, but merely grants rule-making authority within prescribed limits, that is the control, eradication, and prevention of diseases among animals. This being true, R.S. 3:2095 is clearly not unconstitutional.
The argument of the petitioners that the enactment by the Legislature of R.S. 3:2171-3:2188, dealing with the Cattle Tick Fever Eradication program, points to the unconstitutionality of R.S. 3:2095 is untenable. Whatever may have been the purpose of the Legislature in enacting this special statute, it is not for this Court to second-guess and base its opinion on that of the Legislature.
To further strengthen their position the Petitioners call attention to the fact that forty-one states have in one way or another adopted specific legislation on this subject. While this information is indeed interesting, especially to hog farmers, once it has been decided that the delegation of such rule making authority to a Board is constitutional, which we have done, it serves no other purpose than to point out the reasonableness of the practice of requiring garbage to be boiled whatever its source may be.
Petitioners also attack the constitutionality of R.S. 3:9026 on the grounds that it delegate to an administrative board the definition of a criminal action. This is true. However, in the Schwegmann Case, supra, the Supreme Court upheld a similar delegation to the Louisiana Milk Commission to determine which practices are "disruptive" to orderly marketing. Therefore, it is held that R.S. 3:2096 is constitutional.
The next issue to be decided is the reasonableness of Regulation 9 of the Louisiana State Livestock Board dealing with the boiling of garbage being fed to hogs.
The Petitioners rely heavily on the fact that despite repeated violations of Regulation 9, that all of their hogs are free from disease. This is hardly a valid argument.
It must be pointed out that the requirements of Regulation 9 are not without scientific merit, and as Petitioners themselves state, was promulgated as a result of the Vesicular Exanthema outbreak of 1952. Apparently it was an effective measure since as the Petitioners point out that the disease was officially declared eradicated in 1959. It is this fact that petitioners rely on to support their position that Regulation 9 is unreasonable. It is suggested that petitioners recall the old adage, "an ounce of prevention is worth a pound of cure." Also, it must be remembered that the law, especially in the sanitary field, should deal with possibilities and not probabilities. In this regard, this Court must consider the testimony of Dr. Pass, the Chief Federal Veterinarian in the State of Louisiana, relied upon by the petitioners, as follows:
"Q. Well, Doctor, tell me, in all the analyses that have been made in this matter wouldn't it seem to you that it would be, at least out of curiosity that an analysis would be made to determine what in the raw garbage is causing the vesicular exanthema outbreak?
A. Well enough is known about the disease to know that any pork scraps might harbor the virus.
Q. Any pork scraps, and it is when these pork scraps are in the raw garbage that we have the problem, is this not correct?
A. Either in it or the garbage has been exposed to them, yes.
Q. So as a matter of fact if raw garbage were freed from this particular refuse the problem would not be quite so acute, is this right?
A. I think that is substantially true, if we did not have pork to contend with we wouldn't have vesicular exanthema problems.

*252 Q. Pork that is infected, is this not correct?
A. That's true.
Q. So that I will ask you now a hypothetical question, Doctor. If the disease is completely eradicated in this country at the present time, and if the various regulatory agencies will enforce their rules with regard to quarantine, where then would be the source of the virus in this particular country if this infected pork would be kept out?
A. As far as vesicular exanthema is concerned we would probably, possibly wouldn't have the disease again regardless.
Q. Now that clears up vesicular exanthema. * * *"
It is pointed out, as petitioners failed to do, that if there was a strict enforcement of a quarantine on hogs from outside the country (and there is no evidence that this is the case) that "we would probably, possibly wouldn't have the disease again. * * *" And "that," according to the counsel for petitioners, "clears up vesicular exanthema." Fortunately for us, the United States Health Service doesn't regard Bubonic Plague as "cleared up" upon such testimony as that of Dr. Pass.
Further, as mentioned earlier, forty-one states have seen fit to enact specific laws in the area, and the nine other, including Louisiana, have regulations. This fact lends much credence to reasonableness of such regulations, regardless of the manner in which they are enacted, and evidences a general feeling that such regulations are essential.
Also, petitioners rely on the fact that "the only case of vesicular exanthema found in the State of Louisiana since the adoption of Regulation 9 occurred on a farm, no matter how carefully an attempt may be made to explain it away, in which the hog farmer was complying with its regulation of the heat treatment of garbage." The immediate implication is that the boiling of the garbage was ineffective. However, upon a reading of the report (T. 331-332) the true picture is shown. Actually, the farmer involved stated that hogs had not been fed garbage at the time they became ill. Further, the report discloses that the farmer was declared eligible for indemnity since he was cooking garbage in accordance with State regulations and because the swine had apparently been in the incubative stage of the disease at the time he purchased them.
This hardly bears out the contention that Regulation 9 is unreasonable, rather it shows that possibly more strict methods should be used, particularly in the area of enforcement.
Further testimony taken on the trial of this case is pertinent, especially that of Dr. Albin G. Pass, lends strength to the position of the Respondents that Regulation 9 should be continued. When asked how the disease vesicular exanthema was prevented, he replied: "The requirement of garbage cooking is still enforced throughout the nation. There are specially trained diagnosticians who investigate suspicious outbreaks, and the matter now of keeping tight surveillance over the situation so if it does erupt it can be brought under control before it spreads." Later, when asked if the cooking of raw garbage is essential to the swine industry within the state, Dr. Pass replied: "It is essential for the hog cholera eradication program," and that it also "prohibits or helps control or eradicate other diseases, * * *." In this regard Dr. Pass later states that if there were an outbreak of this disease vesicular exanthema within this state that there would "most likely be embargoes placed by the surrounding states at least, and possibly by all other states."
We feel that the case of City of New Orleans v. Charouleau, 121 La. 890, 46 So. *253 911, 18 L.R.A., N.S., 368, is in point. In this case the Legislature granted a charter to the City of New Orleans in which it had the following powers, to-wit:
"The council shall have the power * * * to maintain its [the city's] cleanliness and health, and to this end * * *
"(c) To regulate the location of, and inspection and cleansing of, dairies, stables, cattle-yards, landings and pens, slaughter houses, soap, glue, tallow and leather factories, depositories for hides, and all places of business likely to be or become detrimental to health, and to adopt such ordinances and regulations as shall be necessary or expedient for the protection of health and to prevent the spread of disease, and to maintain a good sanitary condition in the streets, public places and buildings, and on all private premises. The common council shall provide for the frequent inspection of all premises by persons to be designated, either by the common council or by the board of health in the city. * * *"
The Court held as follows:
"We think that, for the purposes specified in the ordinance, the plenary police power has been delegated by this statute to the city council.
* * * * * *
"Defendant next contends that, even if the city council has this power, it cannot delegate the exercise of it to the board of health. But it is the invariable custom to delegate such authority to a board or other functionary, and the authority to do so is well recognized. Fischer v. [City of] St. Louis, 194 U.S. 361, 24 Sup.Ct. 673, 48 L.Ed. 1019." (Emphasis supplied.)
For the above and foregoing reasons, it is evident that Regulation 9 is not unreasonable and therefore petitioners' request is denied.
Affirmed.
LANDRY, Judge (dissenting).
With all due respects to my brothers of the majority, I must respectfully dissent from the holding that the provisions of LSA-R.S. 3:2091-2096, inclusive, are constitutional.
The principal attack made upon the validity of the statute in question by appellants is that it constitutes an unlawful delegation of legislative power and authority because of its failure to prescribe standards or guides pursuant to which the authority vested in the State Livestock Board is to be exercised and the terms of the act are to be administered with the view of accomplishing the purpose thereof.
I readily recognize that under certain conditions legislative authority may be delegated to individuals or administrative boards or agencies as evidenced by the following general statement of law appearing in 16 C.J.S. Constitutional Law § 138, page 617:
"The administration of statutes for the protection of the public health, safety, morals, and welfare generally may be delegated by the legislature to executive officers or agencies.
The authority to adopt measures for the administration of statutes enacted by the legislature, in the exercise of its police power, for the protection of the public safety, morals, and welfare generally may be vested by the legislature in executive officers or agencies. Moreover, the ordinary rule requiring the legislature to prescribe definite rules or standards of guidance is somewhat relaxed by some authorities where regulations under the police power are concerned, although it has also been stated that the legislature must make its exact policy clearly apparent, *254 or must at least prescribe a general standard.

Public health and safety. It is the function of the legislature, as a part of its police power, to make laws for the protection of the public health, and the power to make such laws, or laws for the public safety, may not be delegated to an executive officer or board. The legislature may, however, enact laws in general terms for the public health or safety, and vest in administrative agencies a large measure of discretion in enforcing them, it being sufficient that a definite policy be established for their guidance. Thus, the legislature may give such agencies authority to make reasonable rules, regulations, or orders which shall have the effect of law, and to determine facts on which the operation of a statute depends. Such an agency may not itself prescribe a penalty for the violation of its regulations, but it is competent for the legislature to prescribe a penalty for the violation of rules and regulations thereafter made by the executive agency. (Emphasis added.)
I further recognize that our own jurisprudence is settled to the effect that where adequate standards or guides are prescribed, the legislature may delegate power and authority to administrative boards and agencies. See Michell v. Louisiana State Board of Optometry Exam., La.App., 146 So.2d 863; Woodard v. Reily, 244 La. 337, 152 So.2d 41. In addition, I acknowledge the admitted trend toward liberality in the application of the rule with respect to boards or agencies designed to protect public health and safety. Schwegmann Brothers Giant Super Mkts. v. McCrory, 237 La. 768, 112 So.2d 606.
While the Schwegmann Brothers case, supra, admittedly represents a radical departure from the general rule and weakens somewhat numerous pronouncements in prior jurisprudence, nevertheless this decision itself specifically notes that it does not completely abandon the constitutional restrictions pertinent to cases of this character. I especially refer to the following language appearing in the Schwegmann case, to-wit:
"Due to the complexity of our social and industrial activities, the decisions display an increasing tendency to hold as non-legislative the authority conferred upon commissions and boards to determine the facts or state of things upon which the law intends to make its action depend. It is now well settled that the Legislature may make the operation or application of a statute contingent upon the existence of certain conditions, and may delegate to some executive or administrative board the power to determine the existence of such facts and to carry out the terms of the statute. So long as the regulation or action of the official or board authorized by statute does not in effect determine what the law shall be, or involve the exercise of primary and independent discretion, but only determines Within prescribed limits some fact upon which the law by its own terms operates, such regulation is administrative and not legislative in its nature.
* * * * * *
Undoubtedly the legislature must declare the policy of the law and fix the legal principles which are to control in given cases; but an administrative body may be invested with the power to ascertain the facts and conditions to which the policy and principles apply." (Emphasis added.)
In the instant case I deem it of utmost significance that Section 2095 of the act under consideration, which prescribes the powers of the board in question, provides as follows:
"§ 2095. Power to deal with contagious diseases of animals
The State Live Stock Sanitary Board shall have plenary power to deal with *255 all contagious and infectious diseases of animals as in the opinion of the board may be prevented, controlled, or eradicated, and with full power to make, promulgate and enforce such rules and regulations as in the judgment of the board may be necessary to control, eradicate and prevent the introduction of Texas or tick fever and the fever-carrying tick (Margaropus Annulatus) and all other diseases of animals." (Emphasis added.)
According to Webster's Third New International Dictionary Unabridged, 1963 Edition, the word "plenary" means "complete in every respectabsoluteperfectunqualified."
Therefore, it appears that the legislature, without reserving any control whatsoever, has granted defendant board absolute, unqualified and unrestricted power to deal with all contagious and infectious dieseases of animals as in its opinion may be prevented, controlled or eradicated.
Section 2095, which states the board's powers, appears to be the only power conferring provision of the act. I have carefully perused the entire statute and find nothing in either Section 2095 or in any other paragraph of the act which attempts to set forth any guides, standards or criteria to be followed by the board or within which it shall confine its sphere of activity and operation.
It further appears to me that as a matter of simple deduction, the legislature in granting defendant board plenary power without setting up any standards or guideposts within which such power shall be exercised, has clearly abdicated its law making authority in violation of Louisiana Constitution Article 3, Section 1. I can only conclude from the foregoing that in the instant matter the legislature has vested the board with unbridled discretion and authoritythis, it cannot do.
In my judgment, the case most nearly analogous to the one at bar is that of State of Louisiana v. Morrow, 231 La. 572, 92 So.2d 70, wherein the Supreme Court held unconstitutional the provisions of LSA-R.S. 37:1589, 37:1591, 37:1592 and 37:1600, forming a part of the statute granting to the board of examiners in watch-making authority to regulate the watch-making industry. In the Morrow case, supra, the board was expressly empowered to make rules and regulations for conducting examinations and defining the standards of workmanship and skill necessary for the licensing of persons engaged in the business of watch-making. In addition the board was authorized to promulgate rules and regulations to carry out the intent of the act.
The Supreme Court held that those sections of the act which delegated the legislature's power to the board to make rules and regulations for conduct of examinations define standards of workmanship and skill and promulgate rules and regulations constituted an unlawful delegation of legislative power and were therefore null and void.
In my judgment, the terms of the statute involved in the Morrow case, supra, and the instant case are for all practical purposes substantially similar in import except that use of the words "plenary power" in the instant matter clothes the present statute with an even more patent illegal delegation of legislative authority in that on its face it surrenders all measure of legislative control.
I, therefore, respectfully dissent.
Rehearing denied.
LANDRY, J. dissents from refusal to grant a rehearing.