SARTAIN, Judge.
The Louisiana Division of the Horsemen’s Benevolent and Protective Association (HBPA), several owners of thoroughbred horses racing in Louisiana, individually and as directors or officers of the HBPA, and Jack DePee, individually and as President of the HBPA, filed a petition for an injunction with the Civil District Court for the Parish of Orleans, naming as defendants the Louisiana State Racing Commission (Commission), its chairman! its members, and its stewards. Petitioners sought to enjoin the enforcement of an amendment to LAC 11-6:20.13 of the Rules of Racing. Passed on February 6,1979 this amendment increased fees to be paid jockeys for their services when riding horses in races in Louisiana. Several licensed Louisiana jockeys intervened in the lawsuit in opposition to the petition for injunction. The defendants excepted to the petition on the grounds that plaintiffs have no right of action and/or have failed to state a cause of action, based upon plaintiffs’ failure to allege compliance with Section 963 of the Administrative Procedure Act, R.S. 49:951 et seq., which sec *591 tion states the prerequisites to an action for a declaratory judgment as to the validity or applicability of an administrative rule. The matter was heard and submitted on stipulation of the facts and evidence. The district court, pursuant to written reasons, overruled the exceptions filed by the defendants and ordered a permanent injunction prohibiting the defendants from any implementation and/or enforcement of LAC 11-6:20.13 of the Rules of Racing. A suspensive appeal, returnable to the Supreme Court, was granted the defendants and the intervenors. The Supreme Court determined to treat the appeal as an application for a remedial writ, which was granted, and the case was transferred to this court. 383 So.2d 790, Art. 5, § 5(D), La.Const. (1974).
The district court found that the jockey mount fee schedule is, in fact, a minimum fee schedule and found that the Commission itself interprets it as such. The court stated that there was no legislative authorization for the Commission to adopt a rule establishing any fee, except for certain license fees, and determined that such establishment would be too broad a power to be derived from the general statutes authorizing the business of horse racing in Louisiana. The district court stated in support of its decision that the Due Process Clauses of the Louisiana and United States Constitutions preclude establishment of minimum wages without specific legislative authority. We disagree.
The issues very similar to those presented in the instant litigation have been addressed in several of our sister jurisdictions. As to be expected, the results differ. In Gilligan, et al. v. Pennsylvania Horse Racing Commission, et al. (No. 69) and Jockey’s Guild, Inc., - Pa. -, 422 A.2d 487 (1980), and Colella v. State Racing Commission, 360 Mass. 152, 274 N.E.2d 331 (1971), the courts determined that the enactment of a rule designating jockey fees in the absence of contract was within the agencies’ general grant of authority. However, in Chicago, Div. of Horsemen's B. & P. Ass’n v. Illinois Racing Board, et al., 53 Ill.2d 16, 289 N.E.2d 421 (1972), the court held that it was not. For reasons hereinafter stated, we conclude that the Louisiana Racing Commission is vested with such authority.
Plaintiffs challenge the constitutionality of the jockey mount fee schedule on the grounds that (a) it denies owners and trainers equal protection of the law because the fees payable to other permittees and/or other persons licensed by the Commission are not regulated by the Commission; (b) it denies owners and trainers equal protection of the law because it abridges or interferes with their freedom of contract; (c) it deprives owners and trainers of their property and freedom to contract in violation of due process; and (d) the Commission has no authority under R.S. 4:141 et seq., to fix jockey mount fees. In the alternative, plaintiffs contend the legislature cannot give power to the Commission to set jockey mount fees without establishing certain controls or standards for the exercise of such authority.
Act 276 of 1940, R.S. 4:141 et seq., legalized public parimutuel wagering when conducted within an enclosure where horse races have been licensed by the Louisiana State Racing Commission. Gandolfo v. Louisiana State Racing Commission, 227 La. 45, 78 So.2d 504 (1954). The pertinent statutes have been supplemented, amended, and reenacted by many acts of the legislature, including Acts of 1956, 1964, 1968, 1973, 1974, 1976, 1977, 1978 and 1979. Section 141 of Title 4 of the Revised Statutes sets forth the legislative intent and policy in this area.[1] Section 142 states the purpose of the *592 racing law.[2]
The Racing Commission is charged to carry out the racing law in Section 147, the pertinent provisions of which read as follows:
“The commission shall carry out the provisions of this Part, including the following specific duties:
******
“(6) To make rules and regulations for the holding, conducting, and operating of all race tracks, race meets, and races held in Louisiana, provided such regulations are uniform in their application and effect.”
Prior to its amendment in 1978 Section 148 set forth an illustrative list of fifty-four specific items for which the Commission was charged with making rules, regulations, and conditions. This section now reads:
“The commission shall make rules, regulations and conditions for the holding, conducting and operating of all race tracks, race meets and races held in this state and for the conduct of the racing industry of this state under this Part. Special rules, regulations and conditions may be promulgated separately for thoroughbred racing and for quarter horse racing. Said rules, regulations and conditions shall be consistent with this Part and provide for and deal with all matters necessary to the holding of such race meetings.”
The evidence shows that at least since 1955 the Commission has promulgated Rules of Racing containing a provision for fees to be paid jockeys riding in races. From 1955 through 1971 the pertinent provision read as follows:
“In the absence of a specific contract to the contrary, the following jockey fees shall apply: * * *” (a particular jockey mount fee schedule.)
The present rule, LAC 11-6:20.13, provides:
“The fee to a jockey in all races shall be deposited with the horsemen’s bookkeeper in advance and shall be, in the absence of special agreement, as follows: * * *” (a particular jockey mount fee schedule.)
Louisiana Civil Code Article 13 states:
“When a law is clear and free from all ambiguity, the letter of it is not to be disregarded, under the pretext of pursuing its spirit.”
*593 Accepting as a fact that the jockey mount fee schedule is customarily interpreted by persons in the horse racing business as a “minimum fee” schedule, the clear and unambiguous wording of LAC 11-6:20.13 is otherwise. The rule unequivocally provides that the schedule shall only apply in the absence of a specific agreement or contract to the contrary. Regardless of the customary interpretation placed upon the rule, following the precept of C.C. art. 13 and noting that the rule has been worded substantially the same since 1955, this court concludes that no “minimum fee” schedule is set by LAC 11-6:20.13. If persons in the horse racing business interpret the rule as such, they do so without legal compulsion. So long as the jockey mount fee schedule allows the horse owner and the jockey to reach their own compensation agreement, there cannot be a deprivation of due process under the Fourteenth Amendment of the federal constitution or under Article 1, Section 2 of the state constitution.
Plaintiffs contend that the fee schedule violates the equal protection provision of the state and federal constitutions and the state constitution’s prohibition against special laws. Parties similarly situated (licensees and permittees under the racing law) are treated differently under LAC 11-6:20.-13; jockeys are afforded a fee schedule in the absence of a contract or agreement with the horse owner, while other licensees and permittees are not so treated.
The Supreme Court in Everett v. Goldman, 359 So.2d 1256 (La.1978), addressed an equal protection challenge to the Medical Malpractice Act at 1265:
“Both the federal constitution and the Louisiana constitution mandate equal protection of the laws. U.S.Const. fourteenth amend.; La.Const., art. I § 3. Under traditional analysis this constitutional guarantee means that separate classifications are invalid in circumstances where it is not demonstrable that a ‘compelling governmental interest’ exists (Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 [1969]) when the law violates a ‘fundamental’ interest (Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 [1974]); or when a law is based upon a trait which renders it ‘suspect’ (San Antonio Independent School District v. Rodriquez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 [1973]). But in all cases where separate classifications are at issue, ‘the crucial question is whether there is an appropriate governmental interest suitably furthered by the differential treatment.’ Police Dept. of Chicago v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972); see Succession of Robins, 349 So.2d 276 (La.1977). Stated another way, the issue in cases where no fundamental right or suspect classification is present is whether the discriminatory treatment is supported by any rational basis reasonably related to the governmental interest sought to be advanced by it. Succession of Robins, supra.”
The court goes on to say at 1266:
“But the statute does not affect fundamental rights or create a suspect classification. Fundamental rights include such rights as free speech, voting, interstate travel and other fundamental liberties. See Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); compare San Antonio Independent School District v. Rodriquez, supra. Suspect classifications are those involving such unalterable traits as race, alienage and religion. Chabert v. Louisiana High School Athletic Ass’n., 323 So.2d 774 (La. 1975).”
The right to be assured a prescribed fee for services in the absence of a fee agreement for such services is not a fundamental right. Neither is the class of licensee or permittee under the racing law comprising “jockeys” a suspect classification. It merely differentiates those persons mounting horses in races from other persons in the racing business. “Thus, because the ‘compelling state interest’ test is not appropriate in this case, a lesser standard must be utilized. Under this lesser standard, the *594 thrust of our inquiry becomes this: what valid state purpose is reasonably furthered by this legislative classification.” Everett v. Goldman, above, at 1266.
The valid state purpose said to be served by the rule providing a jockey mount fee schedule is to promote the orderly conduct of horse racing by preventing conflict and disagreement between horse owners and jockeys. Having a predetermined jockey mount fee schedule allows the race to proceed in an orderly and timely fashion when, for various reasons, there has not been time for a particular horse owner and jockey to reach a compensation agreement. There is no evidence to show that lack of a fee schedule for other licensees or permit-tees, as listed in R.S. 4:169, tends to disrupt the orderly conduct of racing. On the other hand, there is uncontroverted testimony to show such possible disruption in the case of jockeys. Because the rule in question is rationally related to an appropriate governmental interest under R.S. 4:141 and 142, the orderly conduct of horse racing, LAC 11-6:20.13 does not violate federal or state equal protection.
Art. 3, § 12, La.Const. (1974) prohibits certain special or local laws. Plaintiffs contend that the jockey mount fee schedule violates this article, which provides in pertinent part as follows:
“Except as otherwise provided in this Constitution, the legislature shall not pass a local or special law:
* * * * * *
(6) Regulating labor, trade, manufacturing, or agriculture; fixing the rate of interest .... ”
The Supreme Court addressed constitutional challenges to a statute relating to certain court clerks and constables in Davenport v. Hardy, 349 So.2d 858 (La.1977). The court distinguished “general” laws from “local or special” laws at 863, as follows:
“We held in State v. Clement, 188 La. 923, 178 So. 493 (1938), that a ‘general’ law is one which operates equally and uniformly upon all persons brought within the relations and circumstances for which it provides, or one which operates equally upon all of a designated class, founded upon a reasonable and proper classification. A ‘local’ or ‘special’ law is one which because of its restrictions can operate upon or affect only a portion of the citizens, or a fraction of the property embraced within the classification created.”
The court in Davenport v. Hardy, supra, then quoted from its decision in Teachers’ Retirement System of Louisiana v. Vial, 317 So.2d 179 (La.1975), as follows in pertinent part:
“In contrast, a statute is special if it affects only a certain number of persons within a class and not all persons possessing the characteristics of the class. In essence, a special law is one directed to secure some private advantage or advancement for the benefit of private persons.”
In the instant case LAC 11-6:20.13 operates equally and uniformly upon all jockeys mounting horses in races in the state. Having found the rule’s classification of jockeys, as opposed to other licensees and permittees, to be reasonable, the rule applies to a “general” class, rather than a “special” one. The rule secures no private advantage for the benefit of certain jockeys, as opposed to other jockeys, and therefore is not prohibited by Art. 3, § 12 of the state constitution.
There can be no question that the legislature had the power to delegate to the Commission the power to adopt reasonable regulations it believed necessary for implementing the legislative purpose. As the Supreme Court in Johnson v. Pearce, 313 So.2d 812 (La.1975), stated at 818:
“This delegation is not a delegation of legislative power. The legislature has merely committed to a board of men with expertise the duty of drafting and revising rules and regulations as may be found necessary according to the times and circumstances. Isenhour v. State, 157 Ind. 517, 62 N.E. 40, 87 Am.St.Rep. 228 (1901).”
*595 The court in Johnson v. Pearce, supra, quoted the United States Supreme Court in United States v. Rock Royal Co-operative, 307 U.S. 533, 574, 59 S.Ct. 993, 1013, 83 L.Ed. 1446, 1470 (1938), at 819, as follows:
“From the earliest days the Congress has been compelled to leave to the administrative officers of the Government authority to determine facts which were to put legislation into effect and the details of regulations which would implement the more general enactments. It is well settled, therefore, that it is no argument against the constitutionality of an act to say that it delegates broad powers to executives to determine the details of any legislative scheme. This necessary authority has never been denied.”
By granting “full powers” to the Commission in R.S. 4:141 the legislature intended to grant the broadest power possible. Again, by instructing the Commission in R.S. 4:148 to provide for and deal with “all matters”, the legislative intent to grant broad powers is evidenced. Having defined its policy to promote the business of horse racing and to institute and maintain a regulatory program for that business, the State, acting under its police powers to promote the public health, safety, and welfare, has validly empowered the Commission to adopt rules and regulations to effectuate the legislative will. R.S. 4:141 et seq. See Johnson v. Pearce, supra, at 819 and cases cited therein.
As mentioned above the legislature has seen fit to supplement, amend, and reenact the racing law, R.S. 4:141 et seq., many times since 1955, the earliest year the jockey mount fee schedule appears in evidence. If the legislature had not intended the Commission to adopt this particular rule it is reasonable to assume that the legislature would have amended the racing law so as not to permit it. See Traigle v. PPG Industries, Inc., 332 So.2d 777 (La.1976). Instead, the rule has not been challenged legislatively or judicially until plaintiffs instituted the present suit. In fact, the evidence shows the jockey mount fee schedule has been relied upon by horse owners and jockeys alike in this state for well over twenty years.
In Schwegmann Brothers Giant Super Markets v. McCrory, 237 La. 768, 112 So.2d 606 (1959), the Supreme Court addressed the question of unlawful delegation of legislative power to an administrative agency. In upholding a broad grant of power against a challenge based upon lack of legislative control the court stated at 615:
“An Act of the Legislature is presumed to be legal until it is shown to be unconstitutional, and the lawmakers would indeed be hard put to draft legislation were it necessary to cover every conceivable contingency or to foresee and prohibit acts of an irresponsible administrator. The purpose and intent of the subject statute is clearly expressed, and the Commissioner of Agriculture, specifically declared to be the instrumentality of the State for the purpose of administrating its provisions, is given the duty ‘to execute the legislative intent herein expressed.’ ... We therefore think that the objections raised by plaintiff on the ground that the Act unlawfully delegates legislative power in certain of its provisions are without merit. The authorities cited in support are distinguishable for various reasons, and in view of our further conclusions set out below are not controlling here.”
We are of the opinion that the legislative delegation of authority to the Commission includes the power to adopt a rule fixing a jockey mount fee schedule. It is inconceivable to expect the lawmakers to legislate detailed rules and regulations in every area of legislative interest. In R.S. 4:141, et seq., the legislature fixes the intent and policy of the racing laws. Its responsibility to fix policy has not been delegated to the Commission. The legislature has delegated to the Commission only the “ ‘power to fill up the details’ by prescribing administrative rules and regulations .... ” United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 85, 53 S.Ct. 42, 44, 77 L.Ed. 175 (1932), as quoted in Johnson v. Pearce, above at 819.
*596 Accordingly, we reverse the judgment of the district court which granted plaintiffs a permanent injunction and dismiss this suit at plaintiffs-appellants’ costs.

REVERSED IN PART AND REMANDED.

. R.S. 4:141 reads:
“It is the policy of the state of Louisiana in furtherance of its responsibility to provide revenues for the operation of state government for its people, to acknowledge and declare that the providing of funds and financial assistance to licensed horse racing tracks in the state of Louisiana constitutes an authorized public function and purpose of the state of Louisiana, to encourage forceful and honest statewide control of horse racing for the public health, safety, and welfare by safeguarding the people of this state against corrupt, incompetent, dishonest and unprincipled horse racing practices:
*592 “(1) To institute and maintain a program to encourage and permit development of the business of horse racing with pari-mutuel wagering thereon a high plane.
“(2) To institute and maintain a program to encourage and permit development of the breeding and ownership of race horses in the state.
“(3) To institute and maintain a regulatory program for the business of racing horses, which program assures the protection of public health, safety and welfare, vesting with the commission forceful statewide control of horse racing with full powers to prescribe rules and regulations and conditions under which all horse racing is conducted with wagering upon the result thereof with the state.
“(4) To institute and maintain a program to provide financial assistance that will encourage and permit the development of the business of horse racing by licensed horse racing tracks in the state of Louisiana.
“(5) To institute and provide a program for the regulation, ownership, possession, licensing, keeping, and inoculation of animals on premises under its control and supervision not inconsistent with the rules and regulations of the state livestock and sanitary board.
“This Chapter is an exercise of the police powers of the state to promote the public health, safety and welfare.”

. R.S. 4:142 reads:
“It is the purpose of this Chapter to effectuate the policies set forth in R.S. 4:141 by providing for:
“(1) A program to permit maximum development of the business of horse racing with pari-mutuel wagering thereon.
“(2) A program to permit maximum development of the breeding and ownership of race horses in this state.
“(3) A program of effective regulation of the business of horse racing and to promote the orderly conduct of horse racing.
“(4) A program to authorize and establish procedures for assumption and performance of certain regulating responsibilities in connection with and the licensing, by conferring such privilege to persons, corporations or associations possessed of the personal, professional and business qualifications specified in this Chapter and for the withdrawing of such privileges.”