Dear Mr. Gardiner:
We are writing in response to your request from an opinion dated November 13, 2008 and your supplemental request dated February 10, 2009, which included additional materials.
In your letters, you indicated that at a meeting of the Louisiana State Racing Commission ("the Commission") on August 25, 2008, a member of the Board of Directors of the Horsemen's Benevolent 
Protective Association (HBPA) informed the Commission of certain ongoing issues within the HBPA, and requested that the Commission investigate and take corrective measures with regard to the HBPA. The Commission formally raised a long-standing question in response to the HBPA board member's request, "Does the Commission regulate, or have any regulatory jurisdiction over the HBPA?"
Prior to the Commission's meeting on December 1, 2008, the Executive Director of the HBPA contacted the Commission's legal counsel and informed her that the HBPA had contracted with two racetracks, Louisiana Downs and Evangeline Downs, whereby they agreed that the racetracks could deduct approximately $250,000.00 of purse revenue to offset the expenses of running the quarter horse race meets. The money was being deducted from monies generated by pari-mutuel wagering.
The Commission's Legal Committee then requested that legal counsel obtain copies of any such contracts between the HBPA and the racetracks. Legal counsel was able to obtain copies of three contracts between the HBPA and Evangeline Downs, which contracts have been provided to this office in the Committee's supplemental request. *Page 2 
One of the contracts was a January, 2008 Quarter Horse Meet agreement. That agreement provides that, during an extended race meeting of at least forty days, Louisiana Downs will deduct from the purse moneys to be paid to the HBPA the amount of $6,625.00 per day for marketing, promotions, and other related purposes. The relevant portion of the agreement is discussed in some detail, infra.
According to information in the corporations database of the Louisiana Secretary of State, the HBPA was chartered as a private, non-profit corporation on December 21, 1993, and remains in good standing.
In Louisiana, as in most states, the horse racing industry is closely regulated by the State. See La.R.S. 4:141, et seq. The Commission, created by legislation, has many specific powers and duties, some of which are set forth in R.S. 4:147. In addition to these specific powers and duties, the Commission has very broad rule making and regulatory authority granted to it by R.S. 4:148, which provides in pertinent part as follows:
 § 148. Rules, regulations and conditions
 The commission shall make rules, regulations and conditions for the holding, conducting and operating of all race tracks, race meets and races held in this state and for the conduct of the racing industry of this state under this Part. Special rules, regulations and conditions may be promulgated separately for thoroughbred racing and for quarter horse racing. Said rules, regulations and conditions shall be consistent with this Part and provide for and deal with all matters necessary to the holding of such race meetings.
La.R.S. 4:148 (emphasis added).
The broad stroke of the horse racing laws, the extensive grant of regulatory and rule making authority, and the importance of close regulation of the horse racing industry, leads this office to the conclusion that included within the Commission's broad regulatory authority is the authority to regulate and oversee the activities of the HBPA as they pertain to and may affect the business of horse racing.
The Louisiana horse racing laws were enacted "to encourage forceful and honest statewide control of horse racing for the public health, safety, and welfare by safeguarding the people of this state against corrupt, incompetent, dishonest and unprincipled horse racing practices. . ." in part because of the state's provision funds and financial assistance to the horse racing industry. La.R.S. 4:141 (A). In this respect, the *Page 3 
horse racing laws are considered an "exercise of the police powers of the state to promote the public health, safety and welfare." La.R.S.4:141(B).
The Louisiana Courts recognize this pervasive regulation and control of the horse racing industry. In upholding the Commission's random drug testing policy, the Fourth Circuit Court of Appeal observed that "Louisiana has a vital interest in maintaining the integrity of the horse racing industry which requires close and constant supervision in order to avoid the spread of corrupt, dishonest, and unprincipled horse racing practices." Holtus v. Louisiana State Racing Commission,580 So.2d 469, 470 (La.App. 4th Cir. 1991), writ denied
584 So.2d 1162 (1991); citing Pullin v. Louisiana State RacingCommission, 484 So.2d 105, 108 (La. 1986). In Pullin, the Louisiana Supreme Court allowed the use of evidence obtained through an illegal search in a civil license revocation proceeding before the Commission. The Court decided that the exclusionary rule was inapplicable to such proceedings, observing The Court observed:
 Louisiana has a vital interest in maintaining the integrity of the horse racing industry. . . . Maintaining the integrity of horse racing requires close and constant supervision. The legislature created the Racing Commission to carry out this regulatory task. . . . Extending the exclusionary rule to the Commission's civil Proceedings would impair its ability to regulate. Without close, constant regulation, there is a danger that corrupt, incompetent, dishonest and unprincipled horse racing practices would spread. . . .
Pullin, 484 So.2d at 108 (citations omitted).
The regulatory powers of the Commission are also to be interpreted broadly because "Louisiana has a genuine and legitimate interest in regulating horse racing. . ., [s]ince it involves legalized gambling. . . ." Durham v. Louisiana State Racing Commission,458 So.2d 1292,1295 (La. 1985) (citations omitted). "By granting `full powers' to the Commission in R.S. 4:141 the legislature intended to grant the broadest power possible." Louisiana Division of the Horsemen'sBenevolent and Protective Association v. Louisiana State RacingCommission, 391 So.2d 589, 595 (La.App. 4th Cir. 1980). "Again, by instructing the Commission in R.S. 4:148 to provide for and deal with `all matters', the legislative intent to grant broad powers is evidenced. Having defined its policy to promote the business of horse racing and to institute and maintain a regulatory program for that business, the state, acting under its police powers to promote the public health, safety, and welfare, has validly empowered the Commission to adopt rules and regulations to effectuate the legislative will. . . ." Id. (citation omitted).
The Louisiana Racing Law authorizes the Commission "[t]o institute and maintain a regulatory program for the business of racing horses, . . . vesting with the Commission *Page 4 
forceful statewide control of horse racing with full powers to prescribe rules and regulations and conditions under which all horse racing is conducted with wagering upon the result thereof. . .;"[1] to provide for "[a] program to permit maximum development of the business of horse racing with pari-mutuel wagering thereon . . .;"[2] to provide for "[a] program of effective regulation of the business of horse racing and to promote the orderly conduct of horse racing . . .;"[3] to provide for [a] program to authorize and establish procedures for assumption and performance of certain regulating responsibilities in connection with and the licensing, by conferring such privilege to persons, corporations or associations possessed of the personal, professional and business qualifications specified in this Chapter and for the withdrawing of such privileges . . .;"[4] to "make rules, regulations and conditions for the holding, conducting, and operating of all race tracks, race meets and races held in this State and for the conduct of the racing industry of this state under this Part. . .;"[5] and to promulgate "rules, regulations and conditions . . . consistent with this Part and provide for and deal with all matters necessary to the holding of such race meetings."[6]
Thus, the statues confirm that the Commission is invested with both specific duties "and all other powers necessary and proper to enable it to execute fully and effectually all of the objects, purposes, duties, and policies of this Part."[7] Included in this authority is the very broad power to make rules and regulations "for the conduct of the racing industry of this state. . . ." It is the opinion of this office that to the extent that the affairs of the HBPA pertain to the "business of racing horses," or the "racing industry of this state," its operations and activities are subject to regulation by the Commission. A review of the Horse Racing Laws clearly shows that the HBPA is an integral part of the horse racing business and industry of Louisiana.
To begin with, the HBPA is a "defined term" under the Horse Racing Laws. See La.R.S. 4:143(5). The HBPA is also "designated and recognized as an authorized representative" representing "member and other horsemen racing at licensed race meetings held in the State of Louisiana for the purpose of but not limited to negotiating contracts for such horsemen with all racing associations licensed by the State of Louisiana, relative to purses, hospitalization, medical benefits, conditions, and all other matters of interest and concern to such horsemen." La.R.S.4:179.1. R.S. 4:183 *Page 5 
provides a schedule for the distribution of purses to permittees and to the HBPA as follows:
 A. The monies to be distributed by a licensee as purses to permittees licensed to race horses in Louisiana and the monies to be distributed by a licensee to the Horsemen's Benevolent and Protective Association for the use and benefit of such permittees, their employees, and others, for hospital and medical benefits and for the administrative expenses in providing these benefits shall be and include:
 (1) An amount to be not less than fifty percent of a licensee's commission of the gross pari-mutuel handle retained by it from each race at a licensed race meeting in this state as provided by this Chapter, after all fees required by law have been deducted, plus
 (2) The total amount earned by a licensee for purse supplements under R.S. 4:217 since the completion of its previous meeting as of the first day of the race meeting covered by this Subsection, plus
 (3) The total amount earned by a licensee for purse supplements under R.S. 4:217 during the race meeting covered by this Subsection.
 (4) The total of Paragraphs (1), (2), and (3) shall be allocated by the licensee in not less than the following percentages thereof:
 (a) Ninety-six percent thereof to such permittees as purses.
 (b) Four percent thereof to the Horsemen's Benevolent and Protective Association for the use and benefit of such permittees, their employees, and others as medical and hospital benefits with an amount not to exceed thirty percent aforesaid of the commissions and amounts received by the Horsemen's Benevolent and Protective Association to be used for administrative expenses and other costs necessary to provide the benefits. *Page 6 
 (c) The total of the revenues received by the Horsemen's Benevolent and Protective Association under the provisions of Subparagraph (b) hereof, together with all expenditures made therefrom, shall be published and reported quarterly by it to horsemen actively racing in the state.
 B. Monies due as purses to persons licensed to race horses at race meetings conducted in the state as a result of conditions outlined in R.S. 4:183(A) and the monies due to the Horsemen's Benevolent and Protective Association pursuant to the provisions of R.S. 4:183(A)(4)(b) shall be allocated and distributed during the race meeting at which earned.
 (1) In the event the amount distributed as purses is more than the amount required by R.S. 4:183(A), the overpayment shall be carried forward to the next race meeting conducted by the same association. It shall be carried on the association books as an asset.
 (2) In the event the amount distributed as purses to persons licensed to race horses at race meetings conducted in the state is less than the amount required by R.S. 4:183(A), and more than an amount equal to the average daily purse distribution at the race meeting at which generated, it shall be delivered to the Horsemen's Benevolent and Protective Association for further distribution to persons having earned monies during the meeting, in the direct proportion that the underpayment is to the monies earned by that person at that meeting. In the event the underpayment is less than an amount equal to the average daily purse distribution at that meeting, it shall be retained by the association in an interest bearing account to be used for purses at the next meeting conducted by that association. Interest earned on the account shall be added to the purse paid over and above the amount required to be paid as purses by R.S. 4:183(A).
La.R.S. 4:183.
The HBPA must assign a bookkeeper to each race meeting. See La.R.S.4:185(A). This "Horseman's Bookkeeper" handles and keeps records of all monies paid for the *Page 7 
benefit of horsemen and distributed according to the statutory directives and other administrative and operating costs of the HBPA.See La.R.S. 4:185(B). The accounts kept by the Horseman's Bookkeeper "shall at all times be subject to audit by the legislative auditor or by a certified public accountant approved by the legislative auditor. . ." La.R.S. 4:185(C).
With respect to your specific questions, this office is of the opinion that the broad scope of regulatory powers delegated to the Commission under R.S. 4:141, 142 and 148 would include the power and authority to regulate the activities and operations of the HBPA and that theses powers are not limited to the specific powers listed in R.S. 4:147. In addition, the Louisiana Legislative Auditor has the power, authority and duty to audit the accounts of the Horsemen's Bookkeepers assigned by the HBPA to each race meeting held in the State of Louisiana. This regulatory authority includes within its scope regulatory jurisdiction over purse money earned at a race track and statutorily dedicated for the horsemen, which is paid by a race track to the HBPA for disbursement by the Horsemen's Bookkeeper.
The remaining question is whether the Commission has adjudicatory authority to decide a complaint and/or a dispute made by a member of the HBPA against the HBPA as the statutory representative of horsemen. Again, the broad delegation of power to the Commission would include the authority to administratively adjudicate disputes between the HBPA and its members that pertain to horse racing matters. The horse racing law itself contemplates such administrative procedures for protecting and promoting the public interest, including the orderly and efficient conduct of horse racing, fairness and justice in horse racing, and the peaceful enjoyment of horse racing by members of the public." La.R.S.4:197(A).
It is the opinion of this Office that the scope of this delegation of authority to the Commission includes within its parameters the authority to receive and adjudicate a complaint or dispute made by a member of the HBPA against the HBPA as the statutory representative of horsemen insofar as the complaint dispute arises out of or relates to the application of the horse racing laws and/or the promotion of the public interest in the lawful, orderly, efficient, honest, and fair conduct of the business of horse racing in Louisiana.
Another issue raised by your submissions to this office concerns the January 2008 Quarter Horse. Meet Agreement between Louisiana Downs and the HBPA and other similar agreements which provide for withholdings of purse proceeds by the licensee. It is important to point out that the distribution of the proceeds of each racing purse under La.R.S. 4:183
is mandatory as to the proportion of each purse to be distributed to the licensee, to the Horsemen's Bookkeeper, and to the HBPA, its members, and other *Page 8 
horsemen. The proportion allocated to each such entity is fixed by statute and cannot be altered or modified by a contract or agreement between a licensee and the HBPA.
For the purpose of clarity, the mandatory distribution of purse proceeds under La.R.S. 4:183 provides that revenue generated through wagering at racetracks and off-track wagering parlors is shared with the horsemen. Fifty percent of the revenue is retained by the racetrack, and fifty percent is dedicated to the horsemen. Of the horsemen's fifty percent, the HBPA receives four percent from the racetrack, which is designated for use by the HBPA for its administrative costs and medical benefits. The remaining ninety-six percent of the amount dedicated to the horsemen is disbursed through the Horsemen's Bookkeeper as purse monies.
The materials you submitted to this office indicate that the January 2008 Quarter Horse Meet agreement between Louisiana Downs and the HBPA provides in pertinent part, at Page 3, that,
 Harrah's LA Downs will conduct an extended race meeting of not less than forty racing days. The HBPA will allow Harrah's LA Downs to utilize a rate of $6,625 per race day of the race meeting for marketing, promotions and to obtain a higher host and source market signal fee. To avoid unnecessary transfers of funds, Harrah's LA Downs will retain the aforesaid funds from the distribution due to the HBPA by Harrah's LA Downs. . .
Under La.R.S. 4:183, the money to be distributed by the licensee to the horsemen, and by the licensee to the HBPA for the benefit of the horsemen, employees, hospital and medical benefits, and for administrative expenses is fixed at ". . . an amount to be not less than fifty percent of a licensee's commission of the gross pari-mutuel handle retained by it from each race . . ."
Louisiana Downs must pay at least fifty percent of the proceeds to the horsemen and to HBPA, and is not statutorily authorized to withhold from that amount any fees for marketing or promotions. Thus the above-cited contract may violate the provisions of La.R.S. 4:183. To the extent that the Commission may find that the Agreement violates those statutory requirements, under our analysis above, the Commission has extensive authority to force Louisiana Downs and similarly-situated racetracks to cease the type of withholding described in the contract.
CONCLUSION
Based on the above statutes and analysis, it is the opinion of the Attorney General that the Louisiana State Racing Commission, by virtue of the broad delegation of power from *Page 9 
the legislature to regulate and oversee the business of horse racing, has direct regulatory oversight and adjudicatory authority over the Horsemen's Benevolent and Protective Association as it relates to horse racing. This adjudicatory authority, in the opinion of this office, also extends to complaints or disputes an HBPA member may have against the HBPA, insofar as the complaint or dispute arises out of or relates to the application of the horse racing laws or the business of horse racing, including disputes over the quantification, collection, allocation and distribution of money earned at a racetrack that is statutorily dedicated for the horsemen as purse money, which is paid by the racetrack to the HBPA for disbursement by the Horsemen's Bookkeeper according to the statutory schedule of payments.
We trust that this opinion adequately addresses your requests. If you have any questions, or if we may be of assistance in any way, please do not hesitate to contact this office.
 Very truly yours,
 JAMES D. "BUDDY" CALDWELL ATTORNEY GENERAL
 By: _________________________ JOHN W. SINQUEFIELD First Assistant Attorney General
 JDC:JWS:jv
[1] La.R.S. 4:141(A)(3).
[2] La.R.S. 4:142(1).
[3] La.R.S. 4:142(3).
[4] La.R.S. 4:142(4).
[5] La.R.S. 4:148.
[6] Id.
[7] La.R.S. 4:144(A).